**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:10-cv-184-RJC**

RANDOLPH A. WATTERSON,               )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )          **ORDER**
                                     )
DUANE TERRELL, et al.,               )
                                     )
          Defendants.                )
_____    )

    **THIS MATTER** comes before the Court on Plaintiff's Complaint and Amended Complaint pursuant to 42 U.S.C. § 1983, (Doc. Nos. 1; 15), Plaintiff's Motion for Preliminary Injunction, (Doc. No. 26), Defendants' Motion for Summary Judgment and Memorandum in Support, (Doc. Nos. 39; 40), and Plaintiff's Motion for Summary Judgment and Memorandum in Support, (Doc. Nos. 48; 49). For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgement is DENIED. Plaintiff's Motion for Preliminary Injunction is DISMISSED as moot.

**I.     FACTUAL AND PROCEDURAL BACKGROUND[1]**

    On September 1, 2010, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 against several defendants. (Doc. No. 1). Plaintiff alleged that his legal mail was opened outside his presence, his outgoing mail was censored and read, he was disciplined based on the content of his mail, his mail was lost or misplaced, and Officers Fox and Boone searched his cell and

---

    [1] The facts stated herein are largely uncontested. However, because the Court is granting Defendants' Motion for Summary Judgement, where there are material factual disputes, they have been resolved in the light most favorable to the Plaintiff.

disturbed his legal papers. (Id.). The Court conducted an initial review of Plaintiff's Complaint, dismissed Officers Fox and Boone, and directed service of process on the remaining Defendants. (Doc. No. 4).

### 1. Legal Mail

On February 2, 2010, Defendant Virginia Brookshire ("Brookshire"), working in the Marion Prison mailroom, received two letters addressed to Plaintiff with the following printed return address: "Benjamin R. Gilliatt, 202 Gilliatt Street, Shelby, NC 28150-4727. (Doc. Nos. 1 at 4; 23 at 2). Handwritten under the label on the first letter was "Legal mail for Mr. Watterson." (Id.). The envelope contained a handwritten personal note and a religious picture. (Doc. Nos. 23 at 2-3; 50 at 2). The letter was signed "Love, Chatney." (Id.). Chatney Thomas ("Thomas") is an employee of attorney Benjamin Gilliatt ("Gilliatt"). (Doc. Nos. 23 at 3; 50 at 2). According to Plaintiff, Thomas "put legal mail on the envelope to prevent anyone from reviewing her anticipated private intimate feelings toward Plaintiff to avoid undue embarrassment, however she did not understand that it was against policy." (Doc. No. 50 at 2).

Thomas' second letter also arrived on February 2, 2010. (Id.). Below the printed return address on the second letter, Thomas wrote "ATT. At Law Legal Mail." (Doc. Nos. 23 at 3; 50 at 2). Brookshire opened both of Thomas' letters in front of Plaintiff. (Id.). After Brookshire "noticed that the correspondence was not of a legal nature in one of the 2 letters, she advised that the correspondence was 'contraband' and was being seized. When Brookshire opened the second letter, she discovered that it contained correspondence from the same person, signed 'Love Chatney.'" (Doc. No. 50 at 2). Brookshire gave Plaintiff the religious picture and mailed the letters back to Gilliat. (Id.).

Plaintiff contends that "on one occasion Plaintiff did receive legal mail from Ben Gilliatt

2

but it was never logged into any logbook but instead forwarded to Plaintiff in an already opened envelope." (Id.). Plaintiff "told Defendant Brookshire, 'You opened my legal mail.'" (Id.).

On August 17, 2010, Defendant Duane Terrell ("Terrell") sent Plaintiff a letter clarifying the procedure related to his legal mail. (Doc. No. 40-2 at 8). The letter explained that Plaintiff should notify staff when he has legal mail; staff will inspect the mail for contraband in his presence; Plaintiff will seal the letter; staff will initial the back acknowledging their inspection; and staff will place the mail in the outgoing mailbox. (Id.). Plaintiff "signed [the] new clarification" on August 19, 2010. (Doc. No. 50-2 at 2).

Plaintiff alleges that on August 19, 2010, Defendant Marcella Faircloth ("Faircloth") opened his legal mail, which was properly labeled and contained Plaintiff's Complaint. (Id.). Plaintiff "intentionally sealed that envelope . . . in anticipation of it being opened outside of his presence by a prison official after it had been properly addressed and labeled as 'legal mail . . . '" (Id.).[2] Plaintiff complains that Faircloth "open[ed] that outgoing legal document and delay[ed] its transmission to this Court." (Id.). Plaintiff further contends that Defendant Douglas Newton ("Newton") "picked up the already opened letter and application to sue in this Court, inspected its contents[,] then advised Plaintiff to seal it." (Id.).

Finally, Plaintiff alleges that on one occasion, Defendant Hubert Corpening ("Corpening") "opened Plaintiff's outgoing legal mail addressed to Ben Gilliatt Attorney at Law and read the entire letter in front of Plaintiff and verbally told Plaintiff that if Plaintiff was not talking about legal issues to Plaintiff's attorney[,] he would issue disciplinary reports on

---

[2] Plaintiff admits that on June 28, 2010, Faircloth informed Plaintiff that "he was to send all outgoing mail including legal mail to the mailroom unsealed." (Doc. No. 50-1 at 4) (emphasis added).

Plaintiff."  (Id. at 9).

## 2. Censorship of Outgoing Mail

On February 5, 2010, mailroom staff opened a letter written by Plaintiff and returned to Marion Correctional Institution through the United States Postal Service.  (Doc. Nos. 49-1 at 3 ¶ 11; 50 at 2).  The letter contained unapproved inmate to inmate correspondence and sexual content.  (Doc. No. 49-1 at 17).  Plaintiff was found guilty of committing a C(2) disciplinary offense.  (Doc. Nos. 49-1 at 3 ¶ 11, 9; 50 at 2).  Plaintiff "does not dispute any disciplinary action commenced against him for writing another inmate because . . . he broke a rule."[3]  (Doc. No. 50 at 2).

On April 27, 2010, Plaintiff received permission to write to his son, Randolph L. Watterson, at the Gaston County Jail.  (Doc. Nos. 40-5 at 28; 50 at 3).  Plaintiff subsequently wrote a letter to his son, addressing it to "Andy Watterson."  (Doc Nos. 23 at 4; 50 at 3).  Brookshire informed Plaintiff that he "did not have permission to write to 'Andy Watterson' but had permission to write Randolph L. Watterson only."  (Doc. No. 50 at 3).  Plaintiff states that Brookshire "permanently confiscate[d] and seize[d] this correspondence."  (Id.).

On June 28, 2010, Terrell sent Plaintiff a letter containing the following admonishment:

> This letter is to inform you that reasonable suspicion exists that your incoming/outgoing correspondence may contain threats to security and/or criminal activities that are in violation of NC DOC Policy and Procedure.  Therefore, your correspondence, both incoming and outgoing, will be censored.  Effective immediately, you are instructed to send all outgoing mail to the mailroom unsealed.  All incoming mail will be censored prior to delivery to you.

(Doc. No. 40-2 at 7).  Plaintiff refused to sign the letter.  (Id.; Doc. No. 50-1 at 5).  Plaintiff

---

[3] Plaintiff disputes only the "excessive and multiplicious [sic] punishment inflicted on him where Defendant Brookshire charged him with a C-2."  (Doc. No. 50 at 2).

4

received a second censorship letter on June 29, 2010 and refused to sign that letter as well. (Doc. No. 50-1 at 5). Plaintiff admits that Faircloth informed Plaintiff that "he was to send all outgoing mail including legal mail to the mailroom unsealed," which, Plaintiff contends, he "did beginning on June 28, 2010." (Doc. No. 50-1 at 4).

Plaintiff states that on June 30, 2010, Faircloth read a letter Plaintiff addressed to his brother, Jeff Watterson. (Id.). The letter contained profane language regarding the mailroom staff and Faircloth confiscated the letter. (Id.). Plaintiff was sanctioned "for a C-2 for using profane/lewd language towards staff." (Id.). Plaintiff complains that his "private comment was restricted to the confines of his outgoing mail to his brother and was related to his expression of thoughts of how he felt towards his oppressors." (Id. at 6). Plaintiff contends that being punished for expressing his feelings in a letter to his brother violates his First Amendment freedom of speech. (Id. at 10).

Plaintiff further alleges that he tried to mail a grievance to the prison director but it was opened and returned to him. (Id. at 6). As a result, Plaintiff asked another inmate to mail his grievance for him. (Id.). "After Marion officials discovered that Plaintiff sent this grievance to the director by finding another avenue," Plaintiff "was sanctioned and sent to segregation for 15 additional days, loss of all privileges and again fined $10.00." (Id.).

On September 9, 2010, Newton "wrote Plaintiff up for drawing a picture of 3 demon women with exposed breasts only, and a picture hand drawn of his niece Selina Acuna with enlarged breasts which [were] covered completely in a bathing suit per her request." (Doc. No. 50-2 at 7). "Plaintiff does admit that he told his niece she was pretty and 'sexy' and called her one of his pet names which he refers to as 'hot stuff.'" (Id.). However, Plaintiff contends, "because of Plaintiff's wrongful conviction of statutory rape on a child allegedly in 1997,

Marion Prison officials have continuously victimized Plaintiff and treated him harshly . . . ." (Id.).  Plaintiff complains that "[t]his drawing, along with the correspondence[,] was permanently confiscated."  Plaintiff states that he was "found guilty of using profanity in that letter" and given "additional segregation time which consisted of 60 days' loss of privileges and a $10.00 fine which was lodged against his trust fund and collected without his consent."  (Id.).

On September 20, 2010, Defendant James Washburn ("Washburn") allegedly intercepted a personal letter from Plaintiff which Plaintiff had falsely designated as "legal mail."  (Doc. No. 40 at 10).  Plaintiff does not appear to dispute this contention in his Amended Complaint.  See (Doc. Nos. 50-1, 50-2).  Washburn contends that he returned the envelope to Plaintiff and reminded him of the procedure for sending out legal mail.  (Doc. No. 40 at 11).  He also placed a sign on Plaintiff's cell door which stated "Do not accept legal mail from Mr. Watterson."  (Id. at 8).  Washburn alleges that the sign also stated "Advise him to put a request in to the Unit Management."  (Id.).  However, Plaintiff contends that the sign had no such language, (Doc. No. 50-2 at 8), and the Court resolves this factual dispute in Plaintiff's favor.

In a September 21, 2010 letter to his brother, Plaintiff states "I tried to mail a letter for Ashley to you through another inmate and we got caught by this fat ass Sgt. name[d] Washburn."  (Doc. No. 40-6 at 62).  "On September 23, 2010, Newton wrote a disciplinary report on Plaintiff for using [profanity] in an outgoing letter Plaintiff was attempting to write his brother Jeff.  He then confiscated this letter permanently."  (Doc. No. 50-2 at 8).  Plaintiff "pled not guilty and was found guilty of using profane language and misuse of the mail and received 30 additional days in segregation and the loss of all privileges and a $10.00 fine lodged against his trust fund and collected without his consent."  (Id.).

### 3.    Censorship of Incoming Mail

On March 5, 2010, Plaintiff was advised that mailroom staff confiscated an envelope addressed to Plaintiff from Jeff Watterson, Plaintiff's brother.  (Doc. No. 23 at 3-4; 50 at 3).  The envelope contained a letter from Jeff Watterson and a letter from Plaintiff's son, "Andy,"[4] who was incarcerated in the Gaston County Jail.  (Id.).  This "correspondence was confiscated permanently and was not forwarded to Plaintiff."  (Doc. No. 50 at 3).  Terrell sent a "Disapproval of Correspondence" letter to Jeff Watterson on March 5, 2010, informing Jeff Watterson that the correspondence he sent to Plaintiff had been withheld.  (Doc. No. 40-2 at 6).

On March 13, 2010, Plaintiff's brother, Jeff Watterson, called Brookshire "to inquire into the reasons for what seemed to Plaintiff a consistent and systematic act of harassment perpetuated on Plaintiff and to notify Brookshire that if the constant harassment did not cease, he and Plaintiff's family would seek legal counsel to curtail her actions."  (Doc. No. 50 at 4).  On April 1, 2010, Marion Correction Institution purportedly intercepted a letter from Jeff Watterson to Plaintiff which contained "derogatory comments to one of our staff members" which were considered "threatening and inappropriate."  (Doc. No. 40-5 at 37).

On June 22, 2010, Plaintiff filed a grievance with the North Carolina Department of Correction.  (Doc. No. 50).  Plaintiff stated that he did not receive an envelope containing letters and a medical report sent to him by his family.  (Id.).  Approximately thirty days later, Plaintiff states that he "did obtain this report[,] which resolved his grievance."  (Doc. No. 50 at 4).

On June 28, 2010, Brookshire confiscated a letter from Plaintiff's brother, Jeff Watterson, because "he was advising Plaintiff that he was looking up public information on

---

[4] Plaintiff states that his son, Randolph L. Watterson, is known as "Andy."  (Doc. No. 50 at 3).

Brookshire to see if any other complaints, lawsuits or any other conduct existed." (Doc. No. 50 at 4). Plaintiff states that he "was acting within his constitutional rights to send and receive mail from his brother and compile any research that was 'public information.'" (Id.).

By way of relief, Plaintiff seeks, among other things, damages for "the unfounded and illegal 30 days [he] spent in segregation," for the loss of visits and phone privileges, and for the money he had to pay for his disciplinary infractions. (Doc. No. 1 at 12). Plaintiff also seeks attorneys fees, and "for [his] mail to stop being censored." (Id.).

## II.     LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any

8

inferences from the evidence in the light most favorable to the nonmoving party.  <u>Anderson</u>, 477

U.S. at 255.  "'Where the Record taken as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no genuine issue for trial.'"  <u>Ricci v. DeStefano</u>, 129 S. Ct.

2658, 2677 (2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

## III.  DISCUSSION

While prisoners may not lose all of their constitutional rights upon conviction and

incarceration, <u>Bell v. Wolfish</u>, 441 U.S. 520, 545 (1975), these rights may be curtailed in

furtherance of the legitimate goals or objectives of the correctional institution.  <u>Hudson v.

Palmer</u>, 468 U.S. 517, 524 (1984).  A prisoner's constitutional rights may be impinged by a

prison regulation only if the regulation is reasonably related to legitimate penological interests.

<u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).  When evaluating the constitutionality of prison

regulations, courts must accord prison administrators "wide-ranging deference in the adoption

and execution of policies and practices that in their judgement are needed to preserve internal

order and discipline and to maintain institutional security."  <u>Bell</u>, 441 U.S. at 547.

In <u>Procunier v. Martinez</u>, the Supreme Court considered a challenge to the California

prisons' mail censorship policies and held that restrictions on outgoing prisoner mail must be

generally necessary to protect a legitimate governmental interest.  416 U.S. 396, 414 (1974),

overruled on other grounds by <u>Thornburgh v. Abbott</u>, 490 U.S. 401 (1989); see also Thornburg,

490 U.S. at 413-14 (limiting Procunier to prison policies affecting outgoing prisoner mail).  The

Court struck down California's general censorship policies, but held that censorship of certain

materials was essential to the protection of substantial governmental interests.  <u>Procunier</u>, 416

U.S. at 414 n.14 ("personal correspondence of inmates in federal prisons, whether incoming or

outgoing, may be rejected for inclusion of the following kinds of material:  (1) Any material

which might violate postal regulations, i.e., threats, blackmail, contraband or which indicate plots of escape. (2) Discussions of criminal activities. (3) No inmate may be permitted to direct his business while he is in confinement").

The Supreme Court also required that the decision to censor be accompanied by minimum procedural safeguards including notice of censorship to the sender and recipient of mail and an opportunity to protest to an official other than the censor. Id. at 417. Under Martinez, a limitation on outgoing mail is justified only if the limitation in question: (1) "furthers an important governmental interest unrelated to the suppression of expression;" and (2) is "no greater than necessary or essential" to protect the governmental interest involved. Id. at 413. However, under Martinez, prison officials are not required to show with certainty that a particular correspondence would have adverse consequences because officials are given latitude in anticipating the probable consequences of allowing certain speech in and out of a prison environment. Id. at 414. Implicit in the Supreme Court's ruling that some kinds of outgoing mail may be censored is that inmates' outgoing mail may be opened and inspected by prison officials. Altizer v. Deeds, 191 F.3d 540, 548 (4th Cir. 1999). The Fourth Circuit noted that there is a difference between censorship of mail and inspection of mail. Id. at 548 (holding that the opening and inspecting of prisoners outgoing mail is reasonably related to legitimate penological interests, and is constitutional).

Regulations affecting incoming prison mail are measured under the Turner standard. Thornburgh v. Abbott, 490 U.S. 401, 404 (1989). Such regulations are valid if reasonably related to legitimate penological interests, giving prison officials considerable deference in regulating the delicate balance between prison order and demands of "outsiders" who seek to enter the prison environment. Id. at 404-07; see also United States v. Stotts, 925 F.2d 83, 87-90

(4th Cir. 1991) (legal mail).  With regard to legal mail, the Supreme Court stated that it was appropriate that the state require legal mail "to be specially marked as originating from an attorney, with his name and address being given, if they are to receive special treatment."  Wolff v. McDonnell, 418 U.S. 539, 576 (1974).  Any claim that Plaintiff's right of access to the courts was violated requires a showing of "actual injury to the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts."  O'Dell v. Netherland, 112 F.3d 773, 776 (4th Cir. 1997) (internal quotations omitted).

###### A.      Legal Mail

Plaintiff alleges that Defendants violated his constitutional rights because his "legal mail" was opened outside his presence and because he was prohibited from sealing his outgoing legal mail before it was examined for contraband.  (Doc. No. 50 at 2).  Plaintiff cannot show that Defendants violated his constitutional rights by opening certain items of "legal mail" outside his presence because the "legal mail" that was opened does not meet the definition of legal mail. Defendants' summary judgment materials show that DOC Policy and Procedures, Chapter D § .0308(b)(1), Inmate Use of the Mail, defines legal mail as "mail to and from attorneys, state and federal courts, the Attorney General of the United States or the Attorney General of North Carolina, the judiciary, the Industrial Commission, consular officials, or legal aid services or a paralegal."  (Doc. No. 40-5 at 10).

The personal mail addressed to Plaintiff on February 2, 2010, and marked as "legal mail for Mr. Watterson" was not legal mail as defined by DOC policy.  (Doc. No. 40-5 at 20-22). Moreover, there is no way that Defendants' opening of that mail could have caused actual injury to Plaintiff's access to the courts.  Indeed, the letter was a personal note written by an employee of Plaintiff's lawyer's staff and included a religious picture.  (Id. at 21-22).

11

The second letter Plaintiff received on February 2, 2010 also did not meet the definition of legal mail as defined by the DOC. The second letter included a typewritten return address from Benjamin R. Gilliatt, 202 Gilliatt Street, Shelby, NC 28150-4727. (Doc. Nos. 1 at 4; 23 at 2). "Att. At Law Legal Material" was handwritten underneath the return address. (Id.). This second envelope was opened in Plaintiff's presence and included a personal letter signed "Love Chatney." (Doc. No. 50 at 2). The second letter does not meet the DOC definition of legal mail because its contents were not "legal correspondence from the person whose name and return address appears on the outside of the envelope." DOC Policy and Procedures, Chapter D § .0310(b)(4). (Doc. No. 40-5 at 12).

Plaintiff also contends that a piece of his legal mail, which contained the instant lawsuit, was opened outside of his presence by Faircloth. (Doc. No. 50-2 at 2). Plaintiff complains that Faircloth "open[ed] that outgoing legal document and delay[ed] its transmission to this Court." (Id.). Plaintiff further contends that Newton "picked up the already opened letter and application to sue in this Court, inspected its contents[,] then advised Plaintiff to seal it." (Id.). Newton specifically denies reading the contents of the letter, but states that he "fanned through the pages to ensure the absence of contraband." (Doc. No. 40-6 at 2 ¶ 5).

Assuming Plaintiff's version of the facts, Newton's inspection of Plaintiff's mail did not inhibit his access to the courts. Indeed, the received stamp on the first page of the Complaint indicates that this Court received his Complaint in the Clerk's Office on August 20, 2010. (Doc. No. 1). Further, a single delay or interference with Plaintiff's mail service does not constitute a denial of his right to access the courts, and such delay does not raise constitutional questions. Morgan v. Montanye, 516 F.2d 1367, 1371 (2d Cir. 1975).

Similarly, assuming Faircloth opened Plaintiff's legal mail outside his presence on this

single occasion, such a contention fails to state a claim for relief. Buie v. Jones, 717 F.2d 915, 916 (4th Cir. 1983) (a few isolated instances of improper handling of an inmate's mail, such as opening it out of his presence, do not raise a claim of constitutional magnitude). Moreover, the Court notes that Plaintiff had been advised that he was not to seal his outgoing mail until it was inspected for contraband. (Doc. No. 40-2 at 7-8).

Plaintiff alleges in his Complaint that "he feels" as though he would be hindered in defending his legal claims. (Doc. No. 1 at 4). To the extent that such allegation could be construed as an access to the courts claim, such claim fails as Plaintiff does not allege that Defendants' actions have had any adverse effect on his ability to communicate with the courts and Plaintiff has not shown any actual injury. Lewis v. Casey, 518 U.S. 343, 351-52 (1996).

Similarly, Plaintiff's contention that he tried to mail grievances to the prison director but they were opened and returned to him also fails to state a claim for relief. (Doc. No. 50-1 at 4). The record before the Court shows that Plaintiff successfully filed at least two grievances. (Doc. Nos. 50-1 at 3; 50-1 at 9). Plaintiff's allegation does not constitute a denial of his right to access his administrative remedies. Morgan, 516 F.2d at 1371.

B.    **Censorship of Plaintiff's Mail**

Plaintiff contends that his personal mail was censored in violation of his constitutional rights. DOC policy allows for the censorship of any item of personal mail if it contains any material which threatens to undermine the security and order of the facility, or the mail contains contraband or other material which cannot be lawfully sent through the mail. DOC Policy and Procedures, Chapter D § .0310(c). (Doc. No. 40-5 at 12). The policy also includes a list of reasons for censorship which specifically includes, among other things, that the mail contains threats, stamps or sexually explicit material including pictorial materials which depict the female

breast.  Id. at 13.

Defendants' summary judgment materials show that Plaintiff continually violated the

DOC mail policy beginning in February 2010 when he received two personal letters from

Thomas, an employee of Plaintiff's attorney, in envelopes indicating the contents included legal

mail.  Plaintiff also communicated with female prisoners from Cleveland County Jail by sending

letters which included sexual content.  (Doc. No. 49-1 at 17-20).  Plaintiff attempted to send mail

through other inmates housed at Marion Correctional Institution.  (Doc. Nos. 40-7 at 1–2, ¶ 6;

50-1 at 6).  Further, on March 13, 2010, Brookshire received a phone call from Plaintiff's

brother, Jeff Watterson, in which he questioned Brookshire about the way she handled Plaintiff's

legal mail.  (Doc. No. 40-5 at 6, ¶ 16).

On April 1, 2010, Marion Correctional Institution purportedly intercepted a letter from

Jeff Watterson to Plaintiff which contained "derogatory comments to one of our staff members"

which were considered "threatening and inappropriate."  (Doc. No. 40-5 at 37).  In response, the

DOC sent Jeff Watterson a letter informing him that his derogatory comments regarding staff

were construed as threatening and inappropriate and would not tolerated.  (Id.).  Jeff Watterson

was specifically warned that future inappropriate letters would result in the revocation of his

writing privileges.  (Id.).  On June 28, 2010, Jeff Watterson sent Plaintiff a letter indicating that

he was looking on the Internet for information about Brookshire.  (Doc. Nos. 40-5 at 6, ¶ 17; 50

at 4).

Plaintiff was notified by a letter dated June 28, 2010 that his mail would be censored.[5]

---

[5] The letter providing notice to Plaintiff is substantially in compliance with the
procedural safeguards required in Martinez, which include notice of censorship and an
opportunity to protest to an official other than the censor.  Martinez, 416 U.S. at 417.  Plaintiff
also had the opportunity to protest through the prison grievance procedure.

(Doc. No. 40-2 at 7).  Specifically, the letter explained that Plaintiff's mail would be censored because "reasonable suspicion exists that [Plaintiff's] incoming/outgoing correspondence may contain threats to security and/or criminal activities that are in violation of NC DOC Policy and Procedure."  (Id.).  Plaintiff was instructed to send all of his outgoing mail to the mailroom unsealed and that all incoming mail would be censored prior to delivery to him.  (Doc. No. 40-2 at 7).  On August 17, 2010, Plaintiff was advised that he must adhere to the following procedures for sending legal mail: advise unit management staff when he has any legal mail to be mailed; such mail will be inspected for contraband and sealed in Plaintiff's presence; and inspectors will initial the mail to acknowledge inspection.  (Id. at 8).  Plaintiff was told that incoming legal mail would be opened in his presence and inspected for contraband.  (Id.).

Based on the record before this Court, the DOC's censorship of Plaintiff's mail is reasonably related to legitimate penological interests pursuant to the standard announced in Turner, 482 U.S. at 89.  The DOC's decision was based in large part[6] on Plaintiff's correspondence with his brother, in which Plaintiff's brother indicated that he was searching the Internet for information on Brookshire, coupled with Plaintiff's brother's threatening call to Brookshire.  (Doc. No. 40-2 at 2-3).

The censorship of Plaintiff's outgoing personal mail also meets the standard articulated in Martinez, requiring that the regulation is essential to the protection of an important or substantial governmental interest.  416 U.S. at 413-14.  Indeed, the Court deems the safety and security of prison employees a vital governmental interest which is unrelated to the suppression of expression.  Further, the censorship at issue in this case was not greater than necessary to

---

[6] The decision to censor Plaintiff's mail was also based on Plaintiff's attempts to manipulate DOC's mail policy.  (Doc. No. 40-2 at 2-3).

protect the government interest of the safety and security of the prison staff. Plaintiff was clearly communicating with his brother regarding prison staff and their handling of his mail. (Doc. No. 50-1 at 4). Plaintiff referred to the mailroom staff in a derogatory and profane manner and Plaintiff's brother sent Plaintiff a letter indicating that he was searching the Internet to find information about Brookshire. (Id.; Doc. No. 50 at 4). Therefore, censoring all of Plaintiff's outgoing personal mail for threats regarding the safety and security of staff was justified and was not greater than necessary to protect the government interest of safety and security of the prison staff. Reading Plaintiff's personal mail and inspecting his legal mail for contraband was reasonably related to a legitimate penological interest and did not violate Plaintiff's First Amendment rights.

**C.      Plaintiff's Disciplinary Violations Due to his Outgoing Personal Letters**

Plaintiff contends that the disciplinary violations he received for the use of inappropriate language and art, which included exposed female breasts, in his outgoing mail violates the First Amendment. He argues that he should be able to include his opinions and art work in his mail pursuant to the First Amendment. First, this Court has concluded that Plaintiff's mail was appropriately censored because "reasonable suspicion exists that [his] incoming/outgoing correspondence may contain threats to security and/or criminal activities that are in violation of NC DOC Policy and Procedure." (Doc. No. 40-2 at 7-8). In censoring Plaintiff's mail for threats to security and/or criminal activity, staff determined that Plaintiff violated various DOC policies by using inappropriate language toward staff that was considered disrespectful and profane,[7] and in drawing half naked pictures of women revealing exposed breasts in violation of

---

[7] According to DOC Policy, it is a (C2) disciplinary offense to "[d]irect toward or use in the presence of any State official, any member of the prison staff, any inmate, or any member of

DOC Policy and Procedure.

Confiscation of outgoing mail must further an important or substantial governmental interest unrelated to the suppression of expression. Martinez, 416 U.S. at 413. Plaintiff complains about letters for which he was disciplined and which were not mailed out to his intended recipients. Plaintiff contends that his discipline for the language and art contained in his letters violated the First Amendment. In the first letter, Plaintiff included profane language as well as a drawing of half naked women revealing exposed breasts. (Doc. Nos. 40-6 at 44-46; 50-2 at 2).

The DOC Policy regarding Inmate Use of Mail specifically provides for censorship of personal mail if it contains "pictorial materials which depict exposed full frontal view of uncovered human genitalia, exposed genitalia from the rear or the female breast . . . ." Such items are "deemed a threat to institutional order, security and safety and a threat to inmate rehabilitation and are prohibited." (Doc. No. 40-5 at 13). The rationale for this policy survives both Turner and Martinez standards as the policy of censoring mail containing such pictures is essential to the protection of an important or substantial governmental interest, i.e. institutional order, security, safety and inmate rehabilitation. It is unrelated to the suppression of expression. Moreover, it is not overly broad. The provision is tailored to include very specific pictorial materials. Therefore, this Court finds that Plaintiff's First Amendment rights were not violated by the censorship of this letter.

Plaintiff was disciplined for the contents of a September 21, 2010 letter to his brother because it contained profane language and referred to Washburn, who caught Plaintiff violating

_____

the general public, oral or written language or specific gestures or acts that are generally considered disrespectful, profane, lewd, or defamatory. (Doc. No. 40-6 at 10).

the mail policy, as a "fat ass." (Doc. No. 40-6 at 62). While the profane language may seem merely offensive by itself, it raised a red flag when coupled with the fact that the remark was contained in letter written to Plaintiff's brother. Plaintiff's brother previously wrote Plaintiff suggesting that he could find out information about another staff member who caught Plaintiff violating the mail policy. (Doc. Nos. 50 at 4; 50-1 at 4). When the letter is viewed in this light, it can fairly be interpreted as implicating security concerns. Cf. Loggins v. Delo, 999 F.2d 364, 367 (8th Cir. 1993) (discipline imposed for outgoing mail that had offensive comments about mailroom clerk violated prisoner's First Amendment rights because the offensive language did not implicate security concerns). Plaintiff's own statement that he was "compil[ing] any research that was 'public information'" pertaining to Brookshire shows his propensity to take action against staff who catch Plaintiff violating the rules. (Doc. No. 50-1 at 4). Plaintiff's First Amendment rights were not violated by the discipline he received.

### D.    Sign on Plaintiff's Cell

Plaintiff contends that Washburn posted a sign on his cell that stated "[d]o not accept legal mail from Mr. Watterson." Washburn admits placing the sign on Plaintiff's cell. He contends that he did so on September 20, 2010 because he had to return a letter to Plaintiff that was characterized as legal mail by Plaintiff but was not. Washburn put the sign up, which read, according to Plaintiff, "Do not take legal mail from Inmate Watterson." (Doc. No. 40-7 at 2). The fact that Washburn placed a sign on Plaintiff's cell directing staff not to take Plaintiff's legal mail is not a violation of the Constitution. Plaintiff does not allege that Washburn's actions had any adverse effect on his ability to communicate with the courts and Plaintiff has not shown any other actual injury. See Lewis v. Casey, 518 U.S. 343, 351-52 (1996). Plaintiff's claim against Washburn is dismissed for failure to state a claim for relief.

## IV.  ORDER

**IT IS, THEREFORE, ORDERED** that:

(1)     Defendants' Motion for Summary Judgment, (Doc. No. 39), is **GRANTED;**

(2)     Plaintiff's Motion for Summary Judgment, (Doc. No. 48), is **DENIED**;

(3)     Plaintiff's Motion for Preliminary Injunction, (Doc. No. 26), is **DISMISSED** as

moot.

Signed: September 30, 2011

Robert J. Conrad, Jr.
Chief United States District Judge